Good morning, and may it please the Court, I'm Cliff Gardner. I represent the Appellant David Diaz. If I can, I'd like to reserve two minutes for rebuttal. In light of the Court's admonition this morning, I'll do my best to keep an eye on the clock. I did want to start, actually, by thanking the Court for its courtesy in continuing the matter one day, and in also thanking Mr. Glassman's office. They've always been courteous to me in the past, and they were again today, and I very much appreciated it. Counsel and I agree on what the issue is in this case, and that is whether the trial court's discharge of the juror violated the Sixth Amendment. But there's a threshold issue on which we disagree that I think is critical for the Court's evaluation of the issue, and that is, what is the standard overview? The State's position, of course, is that the deferential provisions of AEDPA, the Anti-Terrorism and Effective Death Penalty Act, apply, particularly 2254D. The defense position, petitioner's position, is that 2254D does not apply. Happily, the facts that govern this issue are not in dispute, and I think there's really two of them. The first is that the State courts did not adjudicate the merits of the federal claim. That issue isn't in dispute. The second fact is that, by its own language, 2254D applies when State courts have adjudicated the merits of a federal claim. And that, of course, is the basis of petitioner's position. The federal issue was not adjudicated in this case, therefore 2254D doesn't apply. Now the State makes two arguments, and I'd like to take them both on head-on here, because it seems to me I have to persuade the Court that those arguments need to be rejected. And the first argument the State makes is that the State Supreme Court, when the defendant was in the process of exhausting his State remedies, they issued a postcard denial in connection with his petition for review. The State's observation is entirely accurate. Indeed, the defendant was represented by appointed counsel, did a petition for review as is required, exhausted the issue, and got a postcard denial. The answer to the State's legal argument in this case is Menendez v. Terhune, this Court's decision in Menendez. That was exactly the situation the petitioner faced in Menendez. In that case, he raised a claim in State court on federal and State grounds. It involved the playing of statements he had made to his own psychotherapist. And in State court, he argued that that violated the State attorney-client privilege, and he also argued it violated due process. The State Court of Appeal addressed the State claim, said not a word about the federal claim, and in exhausting the claim, the State Supreme Court issued a postcard denial. It came to this Court, and the Court said that under these facts, 2254d does not apply. Review is de novo. I think the same rule should apply in this case. Which brings us to the second argument the State makes for application of 2254d, and that is that indeed the State Court does not apply. 2254d says it applies to constitutional claims where the merits have been adjudicated in State court. It doesn't say where the merits of the federal claim or a similar State law claim have been addressed. It just doesn't say that. And again, Menendez v. Terhune, it's the same situation. Now, the dismissal of the juror, is it juror number five? It is. Yeah, the dismissal of juror number five, the factual predicate for it, whatever we say, you know, what the Court will say, all of those facts were adjudicated by the California Appellate Court, correct? I mean, that's the particular facts that we're talking about, right? Those facts were all there, right? Facts were both presented and discussed by the State Court of Appeal. Presented to and discussed by. But the legal claim was not, and that's really what 2254d speaks to. It's the standard of deference towards the legal judgments of State courts. And just as in Menendez, where the State Court of Appeal discussed the facts around the State's introduction of the psychotherapist's testimony, and yet that wasn't sufficient to garner 2254d deference, it shouldn't be sufficient here either. That's simply not what the language of 2254d says. So applying de novo review, then what are we measuring it against under a Sixth Amendment standard? Exactly. And that's exactly where I come to. The question then is what I call, and I'm sure this is a clunky phrase and the Court perhaps has a better phrase, I call it the any possibility test of the United States v. Brown, United States v. Thomas, and this Court's Symington decision. Well, but we didn't go with the any. It was any reasonable. Any reasonable possibility. Then I misstate. Well, the other that may be important, because Brown, I think, did say any possibility. I think if one were to talk to the authors of Brown and Thomas, they would say probably if it's not a reasonable possibility, it's not what we meant to include in our decision. I don't know, but I'm happy to work within the any reasonable possibility. I certainly didn't mean to make a substantive change by omitting the word. And here, there's really two aspects of this test. One is sort of a process aspect, and that is how far can this inquiry go? And the second is a standard for when you can discharge a juror. And Symington and Brown and Thomas speak to both. And the first question in this case is whether the Court's inquiry went too far, and the second question is putting that aside. I mean, if it did, the case is over. And putting that aside, even if it didn't go too far, was there good cause to discharge the juror under the any reasonable possibility test? And here's what the Court's inquiry showed. Recall there were two inquiries. There was one that ended the first day, and there was one that began the second day. And at the end of the first day, the Court spoke with four jurors. And you learned that the jurors started deliberating at 940, and they deliberated two hours. And according to all the jurors that came in, Juror 5 was deliberating, discussing the law and discussing the facts for those two hours. Actually, there was a disagreement by one juror as to how long it went on. But two jurors said that up to around 1140, Juror 5 was discussing the law and discussing the facts. And that around 1140, ten minutes before the Court got the note at 1150, there was a problem. Juror 3 found herself alone, and she felt attacked. And so she was unable to deliberate for that ten-minute period between which 1140 and 1150, when the jurors went to the judge. So that's what the inquiry showed. They called Juror 5 in, and she pretty much said that that's exactly right. I felt like I was being attacked. Juror 5 may have felt like she was in a situation she may never have been in before, in a room with 11 strangers, 12 total, where 11 of them have a position that's contrary to hers. And she may have felt attacked. She may have been attacked. I don't know. And the question is, at that point, does the amendment permit the judge to simply discharge this holdout juror? And there really isn't any disagreement that she was, in fact, a holdout juror. This is Juror 9, the foreperson. When, at the very first question, the Court says, what went on in there? Juror 9 says, referring to Juror 5, she is intimidated by us needing to discuss her opinion and ours, and she just feels ganged up on because she is by herself. So it was pretty clear to everyone in that courtroom what was going on. It was 11 to 1. Isn't that often going to be the case where you have a hung-up jury that is going to be a 1 or maybe 2, but at least usually 1, who is hanging the jury? And the issue, the fine line distinction, then, is she's being discharged because she won't engage in deliberation. She's dug in and emotionally, as the judge here found, emotionally distraught. She's being held for external reasons. Or is she really being bounced because she won't go along and convict? I'm sorry. So we're looking at it. So what deference do we give to the state court, state trial judge's finding that, based on his examination and the like, it was the refusal to deliberate as opposed to unmerits? He didn't know where she was. There's really two things going on, because at the end of the first inquiry, at that point, the judge does what I think the Sixth Amendment permitted him to do and, indeed, what the prosecutor urged him to do. The judge gave the entire jury an instruction which said, basically, look, people get upset during deliberations. Not everyone is Henry Fonda in 12 Angry Men that can reasonably react to 11 people taking a different position and explain his position eloquently and articulately over the course of the next two days and persuade everyone. She obviously wasn't Henry Fonda. And so he gave an instruction which basically told the jury, take a step back. Everybody calm down. Deliberations should be handled cooperatively. You shouldn't be angry at one another. And then he dismissed them for the night. That was entirely permissible. Just because your time is running out, what I want to, I'm not sure, I'm not, you know, regardless on the, well, the AEDPA, whether it's AEDPA or not, is obviously significant, but the trial court's factual findings in terms of, there's another thing that I think is a little bit dicey for you in the sense that, yeah, send some home, you know, let them rest, you know, let everyone kind of regain their composure and come back. But then you have that additional thing which is essentially undisputed that, you know, she had someone in her family that died and apparently, you know, that, and she didn't mention it, that that was something that was bothering her. And, you know, I have to say I probably wouldn't, you know, if I had been the trial judge, I might not have excused her. But on the other hand, this additional factor of the, that she didn't disclose that someone had died and that's why she might get distraught and all of that going on, why wasn't the trial court, you know, permitted to make that, even though I might not have resolved it the same, why wasn't that reasonable? I am out of time. May I answer that question? No, sure. Sure. I guess that's the benefit of being last on calendar. No, it's the benefit of being asked a question by a judge who wants to hear your answer. I see. There's two benefits. Well, that's even, that's even better. There's really a, the first answer to that is that that exchange occurred in an inquiry that should not have happened because the Sixth Amendment permitted the judge to talk to the jurors as he did on the first night and give them the instruction that says, calm down, everybody take, take a step back, we'll start deliberations anew. And then the next morning, without anything additional happening from the jury, and this is what distinguishes this case starkly from cases like Perez v. Marshall where the jury, the judge sent the statement and the jury kept coming back and saying she's doing the same thing, judge. Without any additional problem being revealed from the jury, the court on its own initiates this inquiry which then reveals a death in the family and the fact that she was praying for the strength to be able to be a juror. So the first part is the process. I don't see that as wrong from the standpoint, you talk to someone first, maybe you don't know where they're coming from. You let them go rest, let cooler heads prevail, and then you come back and kind of, okay, so how are you feeling today? You know, can you do it? And then the rest comes down. Sure. And, well, I think there is the process. It's not really getting into the province of the jury deliberations, that's in how do you feel? You know, what's going on with you? Or, you know, can you do what you have to do? And when the court begins to talk about the death in the family and it says, well, was that bothering you yesterday? The juror says, no, it wasn't. There were things going on in the jury room, but this really didn't have a part of it. And what's really interesting, and I found this, and this is another benefit, I guess, of being last on calendar, is that the first case on calendar, there was a lawyer here that had to get to jury duty. And Your Honor sort of made a humorous remark, well, I hope they dismiss you from jury duty. No, I didn't say that. Oh, I'm sorry. I said I hope he got on the jury. Oh, got on the jury. I'm sorry, then I misunderstood. I did on the jury. Well, and people, you were all distinguished lawyers before you were judges, and I'm sure people did to you what they do to me when they get a summons for jury duty. They always ask the same question, how do I get out of jury duty? And they're humorous when they ask it. They're not really seriously asking me, and I don't give them advice on how to get out of jury duty. But more often than not, people perceive jury duty as an obligation that they really don't want to do. It takes up a lot of time. You get $5 a day. It's not like, unless you're on the Peterson case, you're not going to be able to write a book about it. And this juror came back, and she said, you know, I heard what you said yesterday, judge, and I think I can do it. I prayed. I think I can do it, judge. Give me a chance to do it. I heard what you said. And he said, well, you're sure? He gave her a number of chances to herself say what we expect most people to say, which is, I want to get out of jury duty. Are you sure? Is the funeral coming up? This is a lot of pressure on you. Your brother-in-law died. And she said, you know, judge, you impaneled me as a juror, and I can do it. And this is so counterintuitive to what we expect most people to say, I think, perhaps cynically, and maybe I'm the only cynic here. What the court did was said, okay, you've got a prosecutor saying, get rid of this person. And what the court said is, you know, I mean, the court's got to say, do I think you can do it? I've told you what you have to do. I've heard some jurors say that you can't do it. Then, you know, you told me, you're telling me why you think you can do it. You're telling me what's going on in your life. You've got to make a decision. You know, did they shut down and stop deliberating? You know, can they go forward and do it? And I don't think the Sixth Amendment permits a judge in that situation when it's apparent that she is by herself. Because this is really what the jury system is about. It's about a dissenting juror being able to hold out and maybe persuade someone else. It's not about... Yeah, I think that I think we do know. Okay. Why don't we wrap you up? You're into additional time. If you need a minute, I'll move on. Let's hear it from the State. And thank you for your extra time. Good morning, and may it please the Court. Excuse me, David Glassman for the respondent affiliate. We do agree, well, we agree that we disagree, I guess, on the standard of review. But I would submit that the disagreement is actually even more fundamental. And that is that because of the context of this case, because it does arise under the AEDPA as a state court habeas corpus proceeding, it is important to identify in the first instance exactly how the standard of review operates here. And I would submit that it is an even more fundamental disagreement than whether or not there was a state court adjudication, for example, of a federal claim. Because, first of all, if you look back at the pleadings that were filed, this is clearly a case presented to the state courts, as these matters typically are, for resolution under the State Penal Code section involving removal of a juror. That's Section 1089 of the State Penal Code. And predominantly, overwhelmingly, state citations are involved there. State law is cited by both sides to resolve the issue. The question is, this petitioner claims that because there were string cite citations, basically, to, out of the jurisdiction, federal court authorities, none of which was a Supreme Court decision. That is a, I think at the time, a seven-year-old D.C. Circuit case or a 20-year-old Second Circuit case. Well, now, Brown's not a Supreme Court. None of them are. So if you're talking AEDPA, then... Then my point is that this whole discussion of this controlling federal law, I think, is a in fact, to this day, here, now, we can't, we're still not describing any controlling Supreme Court authority or any Supreme Court authority that arguably applies at all in this circumstance. So I think it's very much a reach to claim that there was some controlling federal law that was overlooked here by every court that heard the claim, by the state trial judge, by the state court of The courts resolved the claim as it was presented to them, which is a claim predominantly under the state penal code regarding removal of a juror. And as to that claim, the claim that was preserved, and I have to digress for a moment. The Menendez case is not the same sort of case. Counsel is, counsel who happened to be, I note, counsel for Mr. Menendez in this court. It may be partial to that case, but the fact of the matter is that that case involved a concession by the state that the state courts failed to address a federal claim. And no such concession was made in this case. And in fact, in this case, the claim was the opposite, that there was a failure to exhaust federal claims. But my point is, and this gets Judge Callahan to your observations about the case, that this case comes down to a question of fact. That is, if it's cognizable on habeas corpus at all, and I'm not entirely convinced that it is, it comes down to a question of fact resolved by a trial judge. And that case law from this court and from the state court is absolutely clear and consistent that as to that determination, there is not merely deference due to the state trial judge, but extreme deference. This court has said so in more than one case, including in Perez v. Marshall, which really can be the beginning and the end of the analysis if we look at certain court authority. Perez was a case where there was a holdout juror removed. There is no affirmative indication in this case that this is a holdout juror. There is no indication of really any of the factors that have been relied upon of merely a diligent juror trying to do her best. I mean, if we are to look at the case de novo, we can conceive of the case however we want, I suppose. But the fact of the matter is that this trial judge made very precise factual findings, found this juror not to be credible. I don't need to reiterate what's in the record. It's cited. How far does extreme deference go? Is that maybe not the key issue here? Well, it certainly goes as far as this case, Your Honor, where the reasons for that judge's reaction to the juror are reasonable on their face to the extent that we can reevaluate the juror's credibility at all. And I'm not sure that we can. For example, when the state judge makes a finding, in effect, that the juror has been evasive or disingenuous, has essentially falsified a reason to the court, the judge is troubled by the fact that on day one the juror offers a particular account. On day two she has a different explanation for her conduct. I don't know that we can revisit those. But certainly then the question is, well, that evaluation was considered by the state trial court. And the state trial court has a co-equal ability in this context to evaluate on limited review that factual determination. And the state trial court approved of the state, I'm sorry, the state appellate court approved of the trial judge's resolution of the claim. And if the AEDPA means anything, that is also a factor in the analysis, particularly given the void of any controlling federal authority that would be to the contrary. So whether or not another judge looking at the record might have left, you know, questioned the juror differently or allowed the matter to proceed differently, that's a far cry from the AEDPA standard. Now, if it's litigated under 1089 in the state court, is the law that it would have to, that the code section preserves the essential feature of a jury under the Sixth and Fourteenth Amendments, and I'm looking at the Miller case, is that how we get to your argument? Well, this court has held, and Miller v. Stagner is a case, and I believe there are others, I think Perez makes the point as well, that this court has decided that 1089 facially complies with the Sixth Amendment guarantees that are involved here. But the challenge in this case has nothing to do with the facial challenge to Section 1089. It has to do with the judge's resolution of what largely turned on credibility and factual elements that I would submit are separate and distinct from the validity. It's not disputed in this case whether 1089 is an adequate mechanism to guarantee Sixth Amendment rights. The only question is how did this judge, Judge Tricia Bigelow, how did she resolve that? And as to that portion of the analysis, it's a very limited claim. What's the legal standard against which we're measuring whether or not there was a violation of the Sixth Amendment? You're saying that it was tried under California cases, and so there's no Sixth Amendment claim at all? Or is there a Sixth Amendment claim in the California standards absent of contrary Supreme Court ruling or as good as anything the Ninth Circuit or other circuits have come up with? I'm saying that given that the question before this court has nothing to do per se with the validity of the statute. I understand that. No, I understand that you're... So then the point, it seems to me that the only remaining question, and I do believe that it's such a broad and nebulous question that I'm not sure how it implicates any Supreme Court authority other than merely to say due process, fair trial, you know, and other generalities. We don't look to, say, a case like Simonton that in our circuit, which you also cited, which is that there can't be a reasonable possibility that the juror was dismissed for his or her position for or against the prosecution case. Well, I want to get to this as my time is winding down, Your Honor. So I would say a couple things. First of all, although I don't think the court needs to wait on it, I am aware that in the Mousladen case argued last week in the Supreme Court, I believe one issue that the court will maybe resolve at this point, if it still requires resolution, is to what extent circuit precedent is relevant in the ADPA context. But leaving that aside for the moment, what I submit ultimately... Well, let me tell you where I'd like clarification. You say that this is under ADPA deference, that therefore we have to find, I gather you're saying we would have to find it's contrary to or an unreasonable application of established Supreme Court law. And you start out by saying there is no such law. Even though there was not an explicit consideration of any federal standard or any reference by the California courts to a Sixth Amendment analysis, they went under their own, what is it, Cleveland People v. Cleveland, which its formulation is a little less strict, arguably, than what has been articulated in Symington. Your position is the California analysis is good enough because it's not contrary to or an unreasonable application of anything that's come out of the Supreme Court. Well, that would be my position, yes, but my position would be bolstered by the fact that given that this case was resolved under a state penal code that has been deemed, as a general matter, to be one that reflects sufficiently this court's understanding of how a Sixth Amendment claim is resolved, that at the end of the day or at the end of the 20 seconds or so that I have left, the question is whether or not on this purely factual claim that was, and again, I think a lot, you know, this is not a Henry Fonda conscientious holdout juror scenario, which, by the way, that was juror misconduct in that play I have to always remind people. But at any rate, they did the experiment. You know, that case would be reversed if he were convicted. At any rate, my point, I'm sure it would be a memorandum. No, you guys would take us out. Well, you know, Mr. Gardner, I would love to get back to the Supreme Court. We had one of those that we'll never forget. Then you can have the first day in October. But the point is that it, I think, is, you know, respectfully to counsel who has certainly enlarged it, what it comes down to when it's all said and done is a trial judge distrusting a juror, distrusting a juror's representations, having adequate reason to do so, and for that reason removing the juror from the trial of the case. All right. Thank you. Thank you very much. We'll give you a minute for rebuttal. You can defend Menendez's case, at least. Well, actually, I do want to make one comment on that. Counsel started his argument by suggesting that there's no controlling Supreme Court authority. My suggestion to the Court is that that really puts the cart before the horse. The question is whether AEDPA applies. If AEDPA applies, then we look at that. AEDPA doesn't apply. There's no adjudication on the merits. Counsel referenced Menendez. I sadly have to remind the Court I lost in Menendez. I'm rarely partial to cases that I lose, so I cite it despite the fact that I'm not really partial to it. The Cleveland case, which Your Honor mentioned, does express the state standard. But the problem with Cleveland is that at page 484 of the opinion, it specifically rejects Simington, Brown, and Thomas. It specifically says, yes, that's the rule under the Sixth Amendment in the federal cases, but we're not doing that. So under de novo review, the suggestion that 1089, as interpreted by Cleveland, is the same is just wrong. Cleveland specifically rejects the view this Court adopted in Simington. And finally, since my minute is seven seconds away, the suggestion that there's no indication this was a holdout juror, and this will be my last comment unless, of course, there's questions. Juror number nine, she is intimidated by us needing to discuss her opinion in ours, and she feels ganged up on because she is by herself. Everyone knew that this was a holdout juror. Unless there's questions, I'm happy to submit it. Thank you, counsel. Thank you both. That was an excellent argument. Thank you. Appreciate it on both sides.
judges: Gibson , Fisher, Callahan